IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JACK R. LAPOINTE,

Petitioner,

v.                                                  Case No. 14-3161-JWB

DEREK SCHMIDT,
KANSAS ATTORNEY GENERAL,
et al.,

Respondents.

**MEMORANDUM AND ORDER**

This case comes before the court on Petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) The matter has been fully briefed and is ripe for decision. (Docs. 21, 25.) The court has reviewed those portions of the state court record which are pertinent to the issues raised in the application and finds that an evidentiary hearing is not warranted. Petitioner's application is DENIED for reasons set forth herein.

Petitioner was convicted of aggravated robbery and aggravated assault following a jury trial in state court and sentenced to 245 months in prison. In a federal habeas proceeding, the state court's factual findings are presumed correct and petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Here, Petitioner does not challenge the state court's findings.[1] Accordingly, the court incorporates the Kansas Court of Appeal's version of the facts:

*The Robbery*

Around 8 p.m. on October 30, 2000, Carrie Wellman was checking out customers at the Payless store when a man walked in with a gun and proceeded to rob the

---

[1] Although Petitioner includes a recitation of the facts from the record, Petitioner's recitation of the facts includes the facts set forth herein and Petitioner does not assert that the state court's factual recitation was erroneous. (Doc. 25.)

1

store. Monica Ortiz was shopping in the Payless store with her three children and was completing her purchase when the robber walked in the store. The robber pointed the gun in Ortiz' face and instructed her not to look at him. The robber also pushed Ortiz' 5–year–old daughter to the ground when she tried to run to her mother. After Wellman gave the robber approximately $1,000 in a plastic shopping bag, he ran from the store. Wellman then called the police.

Carrie Delaney and Brandy Loveall had been shopping at a store in the strip mall and were driving out of the parking lot when Loveall spotted a man carrying a gun and walking fast on the sidewalk. Loveall made eye contact with the man before he passed her and ran between two buildings. According to Loveall, Delaney was driving the car when Loveall saw the man.

When the police arrived at the scene, several officers went to a nearby apartment complex after learning that the robbery suspect had been seen there. Upon arriving at the apartment complex, Officer Eric Thompson saw a woman in the parking lot holding cash in her hand. The woman told Thompson that a Caucasian man had just run through the breezeway and had dropped the money on his way up the stairs. Thompson took the money, which was $138, from the woman and asked her to remain there. Thompson ran through the breezeway to look for the robber but was unable to find him. When Thompson returned to his patrol car, the woman was no longer there.

During their search of the apartment complex area, officers found a plaid shirt and hat in a breezeway and a pair of cloth gloves in the front of one of the buildings. In addition, a police dog that had been brought to the apartment complex to track the suspect's scent pulled a blue and white bandana from underneath a car parked at the complex.

*Eyewitnesses' Description of Suspect*

Detective Karen Borstelman interviewed Loveall on November 1, 2000, and completed a composite sketch of the man she saw carrying a gun on the evening of October 30, 2000. Loveall described the man as Caucasian and standing approximately 6 feet tall, wearing a blue and white bandana on his head, with blond hair sticking out from underneath the bandana. The man was wearing a blue and white flannel shirt and was carrying a double-barreled sawed-off shotgun. Loveall further described the man as being in his early 30's and having a slender build. By the time of trial, Loveall had forgotten some of the details she had given Borstelman and described the man she saw as Caucasian and wearing a bandana on his head, wearing a coat, and carrying a gun. Moreover, Loveall could not recall whether the headlights of Delaney's car were illuminating the shadowy area in which the man was walking. Nevertheless, at trial, Loveall identified LaPointe as the man she had seen on the evening of October 30, 2000.

The other witnesses' descriptions of the robber differed somewhat from Loveall's description. According to Wellman, the man was Caucasian, was in his mid- to late–20's, stood about 6 feet tall, wore a plaid jacket and a bandana over part of his face, and had blond spikey hair with dark roots. Ortiz described the robber as a Caucasian man who was in his mid–20's and of slender build. Ortiz testified that the robber was wearing a cap and had put a handkerchief over his face when he came into the store. Ortiz' 11–year–old daughter, Monserrat Santos, described the robber as a Caucasian man with blue eyes and a muscular build. According to Santos, the robber had blond spikey hair, stood about 6 feet tall, had placed a bandana over his nose and mouth shortly after he had entered the store, and had not been wearing a hat.

Delaney was also interviewed by a detective and gave a description of the man, but she was unable to make a composite sketch. Delaney described the man as Caucasian and standing 5′10″ tall, having a skinny build, wearing nothing on his head, wearing a blue flannel-type shirt, and carrying a white plastic trash bag. Delaney did not see the man carrying a weapon. According to Delaney, she was shown a photo lineup but was unable to make a positive identification. Delaney testified that she had suffered a stroke, which had affected her short-term memory, during the first part of October 2000.

During the investigation of the robbery, one of the officers had commented that an individual named Joseph Seeber seemed to match the suspect's description and lived in the apartment complex just north of the Payless store. A photo lineup was then put together with Seeber's picture.

*Wellman's Eyewitness Identification*

On November 9, 2000, Detective Scott Atwell showed Wellman the photo lineup. In looking at the photographs, Wellman used her hand to cover up the lower half of each of the faces. After approximately 5 minutes, Wellman identified the suspect in photograph number 1 as the robber. Nevertheless, according to Atwell, Wellman indicated that the person depicted in photograph 1 had a fatter face and longer hair than the robber. At trial, Wellman acknowledged that she was unsure of her pick in the photo lineup. Moreover, Wellman testified that she would not recognize the man who robbed her if she saw him again. The person in photograph 1 was Seeber, the target suspect in that photographic lineup.

*Loveall's Failure to Identify Suspect in First Lineup*

On November 15, 2000, Atwell showed the same photo lineup to Loveall. Nevertheless, Loveall immediately stated that all the individuals in the photos were "way too young."

*Atwell's Testimony Concerning Eyewitness Identifications*

Despite Wellman's identification of Seeber in the photo lineup, the police did not attempt to contact Seeber to question him about the robbery. When questioned at trial about why he had not investigated Seeber further, Atwell testified that he had "absolutely no confidence in the way" Wellman picked out photograph 1. Moreover, Atwell explained that he had received a laboratory report stating that Seeber's fingerprints were not those on the latent fingerprint cards collected at the Payless store. Atwell acknowledged, however, that the latent prints did not match LaPointe's fingerprints either. Atwell further testified that he had confidence in Loveall's identification "because she had observed the suspect under no stress whatsoever" and had seen the suspect bare-faced.

*Norton's Interviews With FBI Agents*

During November 2000, Michael Norton was taken into FBI custody on suspicion of bank robbery. During his interview, Norton told FBI agents that he had been told by LaPointe that LaPointe had robbed the Payless store in Roeland Park. Norton stated that he believed that LaPointe had used a shotgun during the robbery and had thrown the shotgun on the roof of a nearby building after the robbery.

After Norton pled guilty to federal bank robbery charges, FBI agents interviewed Norton on January 4, 2001, regarding the Payless robbery. During that interview, Norton admitted that he had been involved with LaPointe in the Payless robbery. Norton stated that he had driven LaPointe to the Payless store and had parked at a nearby apartment complex while LaPointe went to commit the robbery using a shotgun. Norton told the FBI agents that when LaPointe had returned to the car, LaPointe said that he had thrown the shotgun onto the roof of the Fashion Bug, which was a store in the same strip mall as the Payless store.

*Recovery of Sawed-off Shotgun*

Based on this information, FBI Agent Jeffrey Harris contacted Atwell and then met him in the parking lot of the Fashion Bug. With the fire department's help, a 12–gauge sawed-off shotgun was recovered from the roof of the Fashion Bug.

*Loveall's Identification of LaPointe in Second Photo Lineup*

On January 22, 2001, Atwell showed Loveall a second photo lineup with LaPointe's picture in it. According to Atwell, as soon as the photo lineup hit Loveall's hand, she pointed to photo 4 and said "that's the guy." LaPointe was the individual in photograph 4. The ages of the other individuals depicted in the photo lineup were 21, 21, 20, 19, and 25, while LaPointe was 31. This second photo lineup was never shown to Wellman.

*LaPointe's Trial*

LaPointe went to trial on charges of one count of aggravated robbery and one count of aggravated assault. The State's main evidence against LaPointe at trial was Loveall's identification of LaPointe and Norton's statements and testimony that LaPointe had committed the robbery. Although Norton implicated himself in the Payless robbery during his testimony at trial, he had been given immunity in exchange for his testimony against LaPointe. Norton had not received any reduction in his federal sentence for his cooperation in LaPointe's criminal case.

*Norton's Testimony*

During his testimony at trial, Norton stated that he and LaPointe had known each other since 1998. Moreover, both Norton and LaPointe had worked for Norton's father during 2000.

According to Norton, on October 30, 2000, he and LaPointe had planned to do a robbery in a low-key area that had a quick get-away to the highway. Norton testified that he was supposed to get 3/4 of the money that LaPointe got from the robbery because LaPointe owed him money. Once LaPointe decided to rob the Payless store, Norton pulled into the parking lot behind the Fashion Bug to wait for LaPointe.

Norton testified that he brought a sawed-off shotgun that he had obtained from LaPointe. Norton further testified that when LaPointe got out of the car, he took the shotgun and placed it up the sleeve of his sweater. According to Norton, LaPointe was wearing jeans, a pull-over sweater, a ball cap, and a bandana when he got out of the car.

Norton testified that LaPointe came running to the car approximately 15 to 20 minutes later without the gun. LaPointe told Norton that there was a Hispanic woman in the store that was trying to leave, but he had forced her back and told her that no one was leaving. According to Norton, he heard a thump before he saw LaPointe and assumed that LaPointe had probably thrown the gun in a dumpster or on the roof of a building. When LaPointe returned to the car, he told Norton that he had thrown the gun on the roof of the building.

According to Norton, he dropped LaPointe off at the home of LaPointe's girlfriend, Deanna Burch, about 45 minutes after the robbery. Norton testified that Burch's car was parked outside when he dropped off LaPointe. Nevertheless, Burch testified that she was working at an event at Wal–Mart on October 30, 2000, and did not get home until around 9:30 that night. According to Burch, LaPointe did not have a key to her home, and he was not there when she got home that evening. Norton testified that he later disposed of LaPointe's bandana and gloves in a dumpster at his apartment complex. Norton testified that he has been bald on top of his head since he was 20, and his hair is brown but turns semi-blond with a lot of sunlight.

During his testimony at trial, Norton admitted that he had 10 prior convictions for dishonesty or false statement. His criminal history included several convictions for armed robbery and auto theft, which dated back to when he was a juvenile.

*Seeber's Testimony*

The State called Seeber as a witness at trial. Seeber testified that he was not the individual who had robbed the Payless store with a sawed-off shotgun. Seeber further testified that he did not have a car and did not know Norton or LaPointe. At the time of trial, Seeber was 22 years old, 5′9″, and 170 pounds.

*Loretta LaPointe's Testimony*

Loretta LaPointe, who married Jack LaPointe on March 15, 2001, testified that she had seen LaPointe pull a sawed-off shotgun out of the trunk of her car around the beginning of October 2000. Loretta immediately told LaPointe that the gun was not staying there, and she never saw it again. LaPointe told Loretta that he had gotten the shotgun from one of their friends to compensate Norton for a pistol that Loretta had thrown in the river after she had found it in her car.

*Forensic Evidence*

Lila Thompson, a latent print examiner, testified that she was unable to develop any latent prints on the gun that was found on the roof of the Fashion Bug store. Thompson was able to find latent fingerprints on the latent print cards recovered from the Payless store. Thompson compared these latent fingerprints against Seeber's fingerprints, but they did not match. Another latent fingerprint examiner compared the fingerprints on three of the latent print cards with the fingerprints of LaPointe and Norton, but they did not match. He also tested the money recovered from the woman at the apartment complex for fingerprints, but no prints of sufficient value for comparison purposes were obtained.

Sally Lane, a forensic chemist at the Johnson County crime lab, examined the shirt, cap, gloves, and bandana recovered from the apartment complex for DNA evidence. Lane found two hairs on the bandana and additional hairs on the shirt, cap, and gloves. Lane sent the hairs to the Kansas City, Missouri, police crime lab. Lane attempted to obtain additional DNA evidence from the items submitted to her, but she was unable to obtain a sufficient DNA sample.

Robert Booth, the chief criminalist at the Kansas City, Missouri, police crime lab, examined four head hairs and microscopically compared them against LaPointe's hair. Booth compared the hairs with 34 of LaPointe's hairs, which were taken from the top, sides, and front of his head. Booth testified that none of the four head hairs matched LaPointe. According to Booth, his comparison testing did not definitively establish that the head hairs did not come from LaPointe because he had only a representative sample of LaPointe's hair or because LaPointe could have changed

his hair since the hairs were deposited. Nevertheless, Booth testified that those two explanations were "rather remote in occurrence" and that the explanation that the hairs were not LaPointe's was "the most likely outcome." Booth did not compare the hairs to any from Seeber or Norton.

*Alibi Evidence*

LaPointe's alibi presented at trial was that he had been at the home of Loretta LaPointe, his girlfriend and later his wife, on the evening of October 30, 2000. According to LaPointe, he had broken up with Burch by that time and was living with Loretta. Loretta testified that on October 30, 2000, she received a call from work at 7:35 p.m. that she needed to report for the night shift that evening. According to Loretta, she left her home around 9:45 p.m. to work the 10:30 p.m. shift. Loretta testified that she remembered LaPointe being home that evening and eating Halloween candy with her daughter. Loretta further testified that LaPointe was at home from the time she received the call at 7:35 p.m. until she left for work and that he also babysat her children while she was at work.

The State presented rebuttal evidence from Detective Atwell that when he went to Loretta's home on December 18, 2003, she never told him that LaPointe was at home on October 30, 2000. According to Atwell, he served Loretta with a subpoena on March 18, 2004, and asked her then where LaPointe was on the day of the robbery. At that time, Loretta told Atwell that LaPointe had been at home on October 30, 2000, eating Halloween candy with her daughter while she was preparing for work.

*LaPointe's Testimony*

LaPointe testified that he did not see Norton on October 30, 2000, and he did not go to the Payless store. LaPointe further testified that he did not commit the armed robbery and aggravated assault. According to LaPointe, he weighed approximately 240 pounds in October 2000 and was 6 feet tall. During Loretta's testimony, a picture was admitted that was taken of LaPointe around October 28, 2000, which showed him having short dark brown hair.

*Conviction and Sentencing*

The jury found LaPointe guilty of both the aggravated robbery and aggravated assault charges. LaPointe was sentenced to 245 months in prison with his sentence to run consecutive to his sentences in three other cases. His convictions were affirmed on appeal by this court. *See State v. LaPointe*, Case No. 93,709, unpublished opinion filed October 13, 2006. Our Supreme Court denied LaPointe's petition for review on February 14, 2007.

*LaPointe v. State*, 42 Kan. App. 2d 522, 525–32, 214 P.3d 684, 688–92 (2009) ("*LaPointe II*").

The Kansas Court of Appeals affirmed Petitioner's conviction on direct appeal. *State v. LaPointe*, No. 93,709, 143 P.3d 701, 2006 WL 2936496 (Kan. Ct. App. Oct. 13, 2006) ("*LaPointe I*"). The Kansas Supreme Court denied review on February 14, 2007. Petitioner then sought post-conviction relief under K.S.A. 60-1507. The state district court denied his petition. The Kansas Court of Appeals remanded the case for an evidentiary hearing. *See LaPointe II*, *supra*. The Kansas Supreme Court denied review on the State's petition and Petitioner's cross-petition on September 9, 2010. The case was then returned to the district court for a hearing. Following the evidentiary hearing, the district court denied relief. The Kansas Court of Appeals affirmed the denial of relief. *LaPointe v. State,* No. 106,492, 285 P.3d 1044, 2012 WL 4372995 (Kan. Ct. App. Sept. 21, 2012) ("*LaPointe III*"). The Kansas Supreme Court denied review on October 1, 2013.

On February 27, 2014, Petitioner filed a motion in the district court seeking post-conviction DNA testing pursuant to K.S.A. 2014 Supp. 21-2512. On September 2, 2014, Petitioner filed this application for relief under 28 U.S.C. § 2254. (Doc. 1.) Following favorable DNA testing, Petitioner filed a motion in state district court seeking relief from judgment. On April 1, 2015, the district court denied relief. This court stayed proceedings on Petitioner's application pending exhaustion of his state court proceedings on his motion for relief from judgment. (Doc. 5.) On November 23, 2016, the Kansas Court of Appeals affirmed denial of Petitioner's motion. *State v. LaPointe*, No. 113,580, 384 P.3d 1030, 2016 WL 6910200 (Kan. Ct. App. Nov. 23, 2016) ("*LaPointe IV*"). The Kansas Supreme Court affirmed the denial of relief. *State v. LaPointe*, 309 Kan. 299, 434 P.3d 850 (2019) ("*LaPointe V*").

After the state court proceedings concluded, this court ordered the filing of a response and a traverse. (Doc. 12.) Both a response and traverse were filed. (Docs. 21, 25.) Respondent has moved to strike Petitioner's traverse (Doc. 26) on the basis that it is improper because Petitioner

included legal arguments that were not included in the Petition and inserted a new claim. (Doc. 26.) Petitioner asserts that the legal arguments are in response to Respondent's arguments and do not raise new legal arguments. Petitioner acknowledges that the new claim of error, cumulative error, "may be properly stricken." (Doc. 27 at 2.) The court will strike the new claim as it was not included in the petition and Petitioner did not seek leave to amend. *See Vanderlinden v. Koerner*, No. 03-3488-CM, 2006 WL 1713929, at *5 (D. Kan. June 21, 2006) (citing *Loggins v. Hannigan*, 45 F. App'x 846, 849 (10th Cir. 2002)).

Petitioner asserts that a lengthy traverse was necessary due to the fact that the state court proceedings had not concluded at the time he filed his application. Because Petitioner's arguments were based on arguments previously raised in the state court and as a result of the new DNA test results, the court will not strike the remainder of the traverse. Respondent's motion to strike is therefore granted in part and denied in part. Respondent's new claim of cumulative error is stricken from the traverse.

## I.  Analysis

This court's ability to consider collateral attacks on state criminal proceedings is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the highly deferential standard contained in AEDPA, if Petitioner's claim has been decided on the merits in state court, this court may only grant relief under two circumstances: 1) if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or 2) if the state court decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).

A state court decision is 'contrary to' Supreme Court precedent in two circumstances: (1) when 'the state court applies a rule that contradicts the governing law set forth in [the Court's] cases'; or (2) when 'the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from' that reached by the Court. *Williams v. Taylor*, 529 U.S. 362, 406, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). A state court decision constitutes an 'unreasonable application' of Supreme Court precedent if 'the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.' *Id.* at 413, 120 S. Ct. 1495. Thus, '[u]nder § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.' *Id.* at 411, 120 S. Ct. 1495; *see also Thomas v. Gibson*, 218 F.3d 1213, 1219-20 (10th Cir. 2000) (discussing *Williams*).

*Hamilton v. Mullin*, 436 F.3d 1181, 1186 (10th Cir. 2006).

The AEDPA standard '"erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court' and requires the petitioner to show 'that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error beyond any possibility for fairminded disagreement.'" *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 738–39 (10th Cir. 2016) (quoting *Burt v. Titlow*, 571 U.S. 12, 19-20 (2013) (internal quotation marks omitted); *see also Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014) ("Under the [fairminded jurists] test, if all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.") (brackets in original). Under this standard, the state court decision must "be given the benefit of the doubt." *Id.* at 739 (citing *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)).

This court will only consider alleged violations of federal law in reviewing Petitioner's application. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Moreover, the federal questions must ordinarily have been first presented to the state courts to be considered by this court. *Picard v.*

*Connor*, 404 U.S. 270, 277-78 (1971); *but see* 28 U.S.C. § 2254(b)(2) (permitting denial on the merits, despite failure to exhaust state remedies).

Petitioner's application states three grounds for relief related to ineffective assistance of trial counsel: 1) failing to investigate DNA testing of hairs found at the crime scene; 2) incorrectly identifying the address in the notice of alibi and 3) failing to object to the testimony of Detective Atwell regarding the eyewitnesses' testimony.

A claim of ineffective assistance of counsel in violation of the Sixth Amendment requires Petitioner to show that 1) his counsel's performance fell below an objective standard of reasonableness; and 2) but for his counsel's unreasonable errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "These two prongs may be addressed in any order, and failure to satisfy either is dispositive." *Grant v. Royal*, 886 F.3d 874, 903 (10th Cir. 2018) (quoting *Hooks v. Workman*, 689 F.3d 1148, 1186 (10th Cir. 2012)).

In evaluating the performance of counsel, the Supreme Court provided the following:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

. . .

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make

the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland*, 466 U.S. at 689-90 (internal citations omitted).

In this matter, the state trial court conducted an evidentiary hearing on the issues relating directly to trial counsel's performance when considering Petitioner's motion. Therefore, the court finds that an evidentiary hearing is not warranted. Petitioner has not identified what testimony would be presented at a hearing nor has he raised any issue which may be addressed that was not already covered in the evidentiary hearing held by the state trial court. *See Davis v. Workman*, 695 F.3d 1060, 1076-77 (10th Cir. 2012) ("We have said that district courts are not required to hold evidentiary hearings in collateral attacks without a firm idea of what the testimony will encompass and how it will support a movant's claim.") (citation omitted).

**A. Right to Conflict-free Counsel and Failure to Investigate DNA Testing of Hairs**

Petitioner contends that his trial counsel was ineffective for failing to perform DNA testing on the hairs at the crime scene. Petitioner claims that trial counsel's reason for not testing the hairs was because trial counsel believed that Petitioner was guilty. Petitioner asserts that this belief operated as an actual conflict of interest. The Kansas Court of Appeals determined that Petitioner was not denied the right to conflict-free counsel at trial and that the decision to not test the DNA was a tactical decision by trial counsel.

In support of his claim, Petitioner cites to the hearing testimony of Mr. Smith, Petitioner's trial counsel, in which he stated that he was convinced Petitioner was guilty. (Doc. 25 at 29-30.) The quoted testimony was not the entirety of the testimony regarding the DNA testing. The Kansas Court of Appeals summed up the testimony as follows:

> At the evidentiary hearing following the *LaPointe II* remand, Smith testified that his decision not to request further testing of the clothes was part of his trial

strategy. He stated, "Given our strategy and the desire to raise reasonable doubt, I, quite frankly, was afraid of what those results might show and how that might alter my defense." Smith was concerned that hiring a DNA expert could result in information that would hurt, rather than help, LaPointe's defense. DNA test results could affect Smith's ability to put LaPointe on the stand to testify on his own behalf. Smith testified, "I believed that we could establish that it wasn't Jack without finding out information that we may not have wanted to know." Smith stated that his review of the facts of this case caused him to believe that information obtained as a result of further DNA testing was far more likely to "cause a problem rather than create a solution."

Smith did not specifically recall discussing the DNA testing issue with LaPointe. While Smith said he would have taken LaPointe's opinion into consideration, "I don't think it would have changed my thoughts." According to Smith, a "big part" of why he did not request DNA testing was because he was convinced that LaPointe was guilty of the robbery. Smith based this belief on the facts of the case, as well as his knowledge of LaPointe's relationship with Norton and LaPointe's extensive criminal history. Smith did not believe that his opinion regarding LaPointe's involvement crippled the defense.

*LaPointe III*, 2012 WL 4372995 at *11.

Petitioner does not assert that the court of appeals incorrectly cited the transcript. Essentially, Petitioner argues that Smith's belief of Petitioner's guilt over Petitioner's claim of innocence resulted in a conflict of interest because Smith declined to test the DNA due to his beliefs. The court of appeals determined it was not a conflict of interest because "Smith still zealously defended LaPointe and vigorously pursued a theory of defense that LaPointe was not properly identified and did not commit the robbery. Smith's refusal to conduct the independent DNA testing was a tactical decision intended to help LaPointe's defense, not a judgmental decision that invaded the province of the jury." *Id.* at *12.

Petitioner argues that there was an actual conflict of interest, citing to *United States v. Gambino*, 864 F.2d 1064 (3rd Cir. 1988) and *Cuyler v. Sullivan*, 446 U.S. 335 (1980). In *Cuyler*, the Supreme Court held that a petitioner "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348. Petitioner cites *Gambino*

for the proposition that not taking a particular defense strategy can be an actual conflict if the "alternate defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." 864 F.2d at 1070; Doc. 25 at 28-29. The *Gambino* case discussed an alleged conflict arising from representation of another client. *Gambino*, 864 F.2d at 1070-72. That is not the case here.

The typical conflict of interest case usually involves the representation of multiple defendants. *Hale v. Gibson*, 227 F.3d 1298, 1312 (10th Cir. 2000). There can, however, be instances where "a lawyer's self-interest is adverse to the interest of his client." *Id.* To establish such a conflict of interest, "the interest of counsel and defendant must be divergent in the current litigation, such that the attorney has an interest in the outcome of the particular case at issue that is adverse to that of the defendant." *Id.* at 1313. Further, "a defendant who argues that an actual conflict prevented his attorney from providing effective assistance must 'show that his counsel *actively* represented conflicting interests.'" *United States v. Soto Hernandez*, 849 F.2d 1325, 1329 (10th Cir. 1988) (quoting *Cuyler*, 446 U.S. at 350) (emphasis in original).

Petitioner asserts that there is a conflict because of trial counsel's belief that Petitioner had committed the crimes. There is no evidence, however, that trial counsel had an interest in the outcome of the trial that was in conflict with Petitioner's interest. The fact that Smith believed Petitioner was guilty, after reviewing all of the evidence including Petitioner's prior criminal history and relationship with Norton, does not rise to the level of a conflict of interest. This type of "conflict" is more akin to a personality conflict or a lack of trust in that Smith did not believe Petitioner's claims of innocence. *Hale*, 227 F.3d at 1313 ("The fact that [trial counsel] did not like Hale or did not trust him does not rise to the level of a conflict of interest.") (citing *Morris v. Slappy*, 461 U.S. 1, 13 (1983)); *see also United States v. Kelly*, No. CR 97-692 MV, 2001 WL

37125023, at *11 (D.N.M. May 1, 2001) (no conflict because trial counsel was "convinced" of the defendant's guilt). "Personality conflicts are not conflicts of interest." *Id.* (citing *Morris*, 461 U.S. at 13). Petitioner cites no authority for the proposition that an attorney who believes that his client committed a crime after reviewing all the evidence, even when his client denies doing so, is operating under an actual conflict of interest.

Moreover, the Kansas Court of Appeals found that trial counsel zealously defended Petitioner at trial. The court agrees. Smith continued to vigorously contend that Petitioner did not commit the crimes charged. Petitioner's defense included attacking the eyewitness testimony, the lack of DNA evidence, and the deficiencies in the police investigation. *LaPointe III*, 2012 WL 4372995 at *12.

Furthermore, the determination that Smith's decision not to obtain DNA testing was part of his trial strategy is supported by the record. Smith testified that he was concerned that the testing could harm, rather than help, Petitioner's defense. Although the testing ultimately was favorable to Petitioner, the question is "not whether counsel made a strategic choice but whether the investigation supporting counsel's decision was itself reasonable." *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 743 (10th Cir. 2016) (internal quotations omitted). *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington v. Richter*, 562 U.S. 86, 110 (2011). A complete failure to investigate could amount to a constitutionally deficient performance, but that is not what the court of appeals determined occurred. *Ryder*, 810 F.3d at 743. Rather, Petitioner merely asserts that Smith failed to discuss the testing with him and that he would have wanted that testing. While Smith does not recall discussing the DNA testing with Petitioner, Smith did consult with Petitioner "on numerous occasions before choosing not to pursue the independent DNA testing." *LaPointe III*, 2012 WL

4372995 at *12. Smith also testified that he would have made the same decision even if he had obtained Petitioner's input on the testing. *Id.* "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Ryder*, 810 F.3d at 743 (quoting *Anderson v. Sirmons*, 476 F.3d 1131, 1145 (10th Cir. 2007)). To rise to the level of a constitutional violation, Smith's decisions must have been "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy." *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (internal quotations omitted).

In this case, the state had not conducted DNA testing. Moreover, Booth testified that the hairs found at the crime scene were not a match to Petitioner. Although Booth testified that he could not affirmatively eliminate Petitioner, he did not believe that the hairs were a match. Therefore, this is not a case where the state was arguing that the hairs found at the crime scene belonged to Petitioner. (*See* R. Vol. VIII, p. 147) (Prosecutor stated in closing that the hairs appeared not to be those of Petitioner.) Moreover, although Booth testified that it was more likely than not that the hairs belonged to the last person wearing the items, there was no evidence that affirmatively stated that the hairs belonged to the robber. *See LaFevers v. Gibson*, 182 F.3d 705, 722 (10th Cir. 1999) (trial counsel not ineffective for failing to test DNA when favorable DNA test results would not have proved he was not at crime scene). Given the facts presented to the jury, Smith's decision not to test the hairs does not rise to the level of constitutional ineffectiveness. *See Harrington*, 562 U.S. at 108 ("Even if it had been apparent that expert blood testimony could support Richter's defense, it would be reasonable to conclude that a competent attorney might elect not to use it.") "Reliance on the harsh light of hindsight to cast doubt on a trial that took place now more than 15 years ago is precisely what *Strickland* and AEDPA seek to prevent." *Id.* at 107 (internal quotations omitted).

The court further finds that the court of appeals' determination that Petitioner was not deprived of conflict-free counsel was an objectively reasonable application of *Strickland* and *Cuyler*. Therefore, Petitioner's application for relief on this ground is denied.

**B. Incorrectly Identifying the Address in the Notice of Alibi**

Petitioner also contends that his trial counsel was ineffective for including the incorrect address in the notice of alibi defense and attacking the credibility of Loretta LaPointe, the alibi witness, for failing to cooperate by ignoring trial counsel's attempts to contact her. The record shows that trial counsel was required to file a pre-trial notice of alibi in order to rely on the defense at trial. Smith filed a notice of alibi that stated that Petitioner was at an address in Tonganoxie, Kansas, at the time of the crime. The problem with the notice of alibi was that Loretta (and Petitioner) had never resided at that address in Tonganoxie. They were living together at the time of the crime at an address in Kansas City, Kansas. Loretta testified that she had lived at the Kansas City address for eight years. Smith's secretary had obtained the Tonganoxie address by using the internet to search for an address that was connected to Loretta's phone number.

At trial, the incorrect address came up during the prosecutor's cross examination of Loretta. After a conference outside the presence of the jury, the court allowed the notice of alibi to be offered into evidence. Loretta testified that Petitioner was at home on the night of the crime. Loretta testified that she was called into work that evening and the Petitioner watched her children while she went to work. Besides identifying that the Tonganoxie address was incorrect, the prosecutor did not spend much time questioning Loretta about the notice of alibi. On re-direct, Smith questioned Loretta about the Tonganoxie address to which Loretta agreed that she had never provided the Tonganoxie address to Smith's office. Smith then questioned Loretta about her cooperativeness and Loretta agreed that she was not as cooperative with Smith in the few months

prior to trial. Smith then called his secretary, Courtney Beck, to testify how she obtained the

address from the internet. During closing argument, Smith apologized to the jury for the mistake

in the notice. Smith again stated that there were things going on between Loretta and Petitioner

and he wanted to make sure that she was at trial. *LaPointe III*, 2012 WL 4372995 at *9. He also

brought up the cooperation problems. At the evidentiary hearing, Smith testified that he did not

recall asking Petitioner if the address was correct. He further testified that he did not believe that

he attacked Loretta's credibility but that it could have enhanced her "credibility because it's

showing she had, quite frankly, had changed sides and wasn't certain which side she would be on

and came into court and testified to the best of her ability." *Id.* The trial court determined that

there was no prejudice.

Judge Bennett found that Smith gave the wrong address in the notice of alibi
and admitted his mistake. Regarding the claims that the address error undermined
Loretta's credibility, the judge stated:

"Mr. Smith's handling of the issue after it was made known could
cut both ways. He decided to fully expose his reasons for the
mistake. Was this wrong? Should he have just let it go? Using
hindsight, perhaps it would have been better not to have bothered to
explain it. But the court finds that the mistake did not deprive
[LaPointe] of a fair trial. The court cannot find that but for Mr.
Smith's error in listing the address there was a reasonable probability
that the result of the trial would have been different."

*Id.*

The court of appeals agreed:

The prosecutor argued in closing that Loretta's alibi testimony was scripted
and should not be believed. The evidence of Loretta's lack of cooperation indicates
otherwise. It is not unusual for alibi testimony to come from a mother, wife, or
girlfriend who is eager to assert that the defendant could not have done it because
he was with her at the time. The inherent bias behind such testimony is readily
apparent, and such testimony is often rejected by the jury. But here, Loretta's lack
of cooperation served to vitiate, to some extent, that inherent bias. Given her rocky
relationship with LaPointe, it is certainly understandable that she would not be
willing to concoct an alibi to come to his rescue. As Smith testified, rather than

undermining Loretta's testimony, the evidence of her waning cooperation tended to enhance it. Ultimately, the jury did not believe that LaPointe was babysitting Loretta's children on the night of the robbery. It is apparent that the jury found Loveall's eyewitness identification of LaPointe more persuasive. But, LaPointe has not demonstrated that the alibi notice error or the questioning of Loretta's cooperation led to this outcome.

***

We find substantial evidence to support the district court's findings, and we find no error in the district court's legal conclusion. Smith admitted the error in listing Loretta's address, but LaPointe failed to show the necessary element of prejudice. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2042, 80 L.Ed.2d 674, *reh. denied* 467 U.S. 1267 (1984).

*Id.* at *9, 10.

Petitioner argues that Smith's error falls below the objective standard of reasonableness because it was a complete failure to make a reasonable investigation and Petitioner was prejudiced by the error. (Doc. 25 at 32.) Petitioner first argues that the court must review this argument de novo because the court of appeals incorrectly applied the *Strickland* test. (Doc. 25 at 35.) Petitioner points to language in the opinion in which the court states that Petitioner did not demonstrate that this error or the questioning of Loretta's cooperation "led to this outcome." *LaPointe III*, 2012 WL 4372995 at *9. While the court did use that language in the opinion, the court quotes the district court judge's legal conclusion correctly. In that decision, the district court judge stated that "the court cannot find that but for Mr. Smith's error in listing the address there was a reasonable probability that the result of the trial would have been different." *Id.* At the end of the court of appeals' discussion, the court states that it finds no error in the trial court's decision and Petitioner failed to show prejudice, citing to *Strickland*. *LaPointe III*, 2012 WL 4372995 at *10. Therefore, while the court of appeals indicated that Petitioner did not show that this error "led to this outcome," the court of appeals cited the correct standard in the opinion. Moreover, the court of appeals' ultimate holding was that the district court's legal conclusion was correct. Accordingly, the court finds that the court of appeals used the correct standard in evaluating

Petitioner's claim. Moreover, under either standard of review, de novo determination under *Strickland* or the highly deferential AEDPA standard, this court would come to the same conclusion.[2]

Petitioner spends significant time arguing that the conclusion in *LaPointe III* is erroneous because it is contrary to the conclusion of the judges on the panel in *LaPointe II*. *LaPointe II*, however, was decided prior to the evidentiary hearing in which Smith testified regarding his representation of Petitioner. Moreover, *LaPointe II* did not address whether Petitioner was prejudiced by this error because the issue before the court was whether the case should be remanded for a hearing. *See LaPointe II*, 42 Kan. App. 2d at 543 ("In his appellate brief, LaPointe is asking this court to remand the case for an evidentiary hearing on his ineffective assistance of counsel claims. As with the previous issues, the parties have not been given the opportunity to present witnesses on this claim. Based on LaPointe's K.S.A. 60–1507 motion, along with the files and the records of the case, we determine that a substantial issue was presented as to whether LaPointe's trial counsel was deficient in including the wrong address on the notice of alibi.")

Clearly, *LaPointe III* reviewed the entire record, including the evidentiary hearing, prior to making its decision under *Strickland* and it is that decision, as it is the final decision of the state court, that this court is reviewing. Therefore, the court is not persuaded by Petitioner's arguments regarding the *LaPointe II* decision. Turning to the issue before the court, as the court of appeals did not explicitly rule on the performance prong in deciding this issue, the court will move directly to determining whether trial counsel's error in the notice of alibi and the discussion of Loretta's lack of cooperation prejudiced Petitioner. *See Grant*, 886 F.3d at 903 (court may proceed to consider either prong under *Strickland*).

---

[2] In a de novo review, the standard for judging trial counsel's performance remains "most deferential" under *Strickland*. *Harrington*, 562 U.S. at 105.

Petitioner essentially argues that trial counsel's error in failing to determine the correct address for the notice of alibi and then questioning Loretta's cooperation prejudiced Petitioner by calling into question his sole alibi witness. Petitioner cites to *Henry v. Poole*, 409 F.3d 48 (2nd Cir. 2005), in support of his argument. Petitioner asserts that *Henry* stands for the proposition that an erroneous notice of alibi undermines an alibi defense and suggests a consciousness of guilt. (Doc. 25 at 37.) In *Henry*, the defense presented an alibi witness that said the defendant had been with the witness during the day on a Thursday and into the early morning of Friday. 409 F.3d at 64. The problem with this alibi, however, was that the crime was committed in the late evening Wednesday and into the early morning on Thursday. The Second Circuit held that trial counsel's performance was deficient for presenting a false alibi. Essentially, the alibi testimony was completely "irrelevant to show Henry's innocence and instead suggested his consciousness of guilt." *Id.* at 67. As a result, the prosecutor argued that the alibi defense was fabricated and, on closing argument, the prosecutor "proceeded to hammer home the fact that [the alibi witness] gave Henry an alibi only for the wrong time period." *Id.* at 66.

*Henry* does not support a finding of prejudice in this matter. Although the notice of alibi included an incorrect address, that fact was not hammered on during trial. Rather, the jury knew that the incorrect address was the result of a mistake made by Smith and not due to the witness. Additionally, the prosecutor in this case did not attack Loretta's credibility as a result of Smith's questioning regarding her lack of cooperation. Rather, her credibility was attacked due to evidence that Loretta did not tell the investigator until right before trial that Petitioner was with her on the date of the crimes. The relevant portion of the prosecutor's closing argument was as follows:

> Now, there's the evidence that you have heard these past three days, coming up on three days, the only person, in addition to the defendant, who can absolutely say, No, he was not there, is the defendant's wife, Miss Loretta LaPointe. I want to talk to you for just a minute about the version of events she gave.

She testified that she knew these charges were pending from the summer of 2001. She had married Mr. LaPointe just a couple of months before March 2001. She testified today she doesn't know whether she's going to continue the marriage but then it's just a couple of months or three or four months old. Yet, she waits, she defers, she doesn't do anything to try and find out where she was, where he was on the date this occurred until just a couple of weeks ago when Mr. Smith asked her to try and figure that out. That's unbelievable. That's incredible. She made no attempt to figure that out.

(R., Vol. VIII at 150-151.)

Unlike in *Henry*, the prosecutor did not hammer the incorrect address or assert that the alibi was false because of the address or due to Loretta's lack of cooperation. Although the prosecutor asserted the alibi was scripted, the prosecutor made this remark and then stated that Petitioner and Loretta's version of events were identical. (R., Vol. VIII. at 174.) The prosecutor also criticized the alleged delay in learning about the alibi. (*Id.*) ("My husband was with me…. She can come forward at any time. Huh-uh, she didn't. She waited literally a week or two before this trial to come up with that one.")

Ultimately, the court of appeals determined that Petitioner was not prejudiced by the wrong address in the notice of alibi and Loretta's lack of cooperation. The court of appeals agreed with Smith that the lack of cooperation may have actually enhanced her credibility. *LaPointe III*, 2012 WL 4372995 at *9. The question for this court is whether the court of appeals' finding that Petitioner did not establish prejudice was an unreasonable application of *Strickland*. *Strickland* requires Petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams*, 529 U.S. at 391. Petitioner asserts that because of the state's weak case, "the verdict in this case could have been affected by counsel's deficient performance." (Doc. 25 at 38.) "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must

be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Harrington*, 562 U.S. at 104 (internal citations and quotations omitted).

Petitioner contends that his defense was undermined by the error. But, reviewing the transcript, it is clear that the prosecutor challenged the alibi testimony on different grounds. Moreover, there were other witnesses that named Petitioner as the individual who committed the robbery. Based on the court's review of the record, the court of appeals' decision that Petitioner was not prejudiced by this error was not an unreasonable application of *Strickland*.

Petitioner's application for relief on this ground is denied.

### C. Failing to Object to Detective Atwell's Testimony

Petitioner asserts that trial counsel was ineffective for failing to object to Detective Atwell's testimony regarding the eyewitnesses' identification of the robber when presented with the photo line-ups. Petitioner argues that Atwell improperly vouched for Loveall by stating he had confidence in her pick and that this testimony influenced the jury more so because Atwell was a police officer. The court of appeals did not find that counsel was ineffective for failing to object because they agreed with the state that Atwell's testimony was not impermissible vouching but an explanation of the path of the investigation. The court of appeals also determined that Petitioner was not prejudiced by the testimony. Petitioner asserts that this holding was an unreasonable application of *Strickland*. (Doc. 25 at 38-42.)

The court of appeals recounted the following from the trial:

> One of the themes of LaPointe's defense at trial was that Detective Atwell botched the investigation when he focused on LaPointe rather than Seeber. This was made clear in Smith's opening statement at trial when he noted that in a photo lineup Wellman identified Seeber as the robber. Smith stated, "That individual was identified as Joseph [Seeber]. Mr. [Seeber] was not investigated as part of this case and has never been charged in this case and has never been subject to examination regarding this case." Smith returned to this theme in his closing argument when he argued, "The Sheriff's Office dropped the ball on Joseph Seeber."

Wellman testified at trial before Detective Atwell testified. Wellman was the store cashier on duty at the time of the robbery. She heard the robber yell, "No one move." She testified that the robber was carrying a long gun at his side. Wellman collected the money from the safe and the cash register. "He told me to hurry up when I wasn't going fast enough with the money." At that point she said, "I wasn't looking at him.... I didn't really look at him a whole lot." Wellman only observed the robber for 20 seconds. "Once I realized what was going on, I could not look at him anymore." He had a bandana covering his nose and the lower half of his face; only his eyes, forehead, and the top of his head were exposed.

About 2 weeks later, Wellman was shown a photo lineup of various individuals. At the time of trial Wellman could not remember whom she picked out of the lineup. She testified that it took her a while to pick someone out of the lineup. She did so by covering the bottom half of the faces in the photo because she had only seen the upper portion of the robber's face. "I just wasn't for sure who it was that did it, so I just [picked someone] [p]robably because I felt I kind of had to pick someone." She said she would not recognize the man who robbed her if she saw him again. The man she identified as the robber was Seeber.

Loveall also testified before Detective Atwell testified. She was in a car in the parking lot when she saw a man walking fast and carrying what appeared to be a sawed-off shotgun. By this time the robber had pulled the bandana from his face and it was "[p]ulled back over his hair." She and the robber made eye contact, and she stated, "We stared at each other." As the robber passed by, Loveall turned and continued to look at him.

Loveall was shown more than one photo lineup. She said the man she saw was not in the first lineup. She identified LaPointe as the robber in the second lineup. She also identified LaPointe in the courtroom as the armed man she saw running from the Payless store immediately after the robbery.

When the State called Detective Atwell to testify, the prosecutor asked, "Did you ever contact Mr. Seeber, the guy that Ms. Wellman picked out?" Atwell explained that he did not because he had no confidence in the manner in which Wellman picked Seeber out of the photo lineup, but he did have confidence in Loveall's identification of LaPointe.

*LaPointe III*, 2012 WL 4372995, *5-6.

Atwell's testimony on the identification was as follows:

Question: Did you ever contact Mr. Seeber, the guy that Ms. Wellman picked out?

Atwell: No ma'am.

Question: Why not?

Atwell: I had absolutely no confidence in the way Ms. Wellman picked out photograph No. 1, also because of the length of time she took. I could understand the manner in which she was doing it with her hand; and when she said that the kid's face in photograph No. 1 was fatter than that of the suspect, I had absolutely no confidence in her at that time. I also received a laboratory report dated the 15th of November, 2000, stating that Joseph Seeber's fingerprints were not those on the latent fingerprint cards presented to the crime lab from the crime scene. Ms. Loveall, I did have confidence in because she had observed the suspect under no stress whatsoever.[3]

(R. Vol. VII at 67-68.)

Atwell further explained, in response to a question that asked what factors led him to place more importance on Loveall's rejection of the first lineup, that Loveall saw the suspect under no stress and barefaced while Wellman was under stress and saw the suspect with a face covering. *Id.* at 69; *LaPointe II*, 42 Kan. App.2d at 536. This testimony was not objected to. In closing argument, the prosecutor argued that Loveall was able to give an accurate description of the robber and what he looked like. (R. Vol. VIII, 149.)

In Petitioner's initial appeal on the ineffective assistance of counsel claim, a majority of the court of appeals held that Atwell's testimony was improper vouching for the credibility of an eyewitness. *LaPointe III*, 2012 WL 4372995, *4 (citing *LaPointe II*, 42 Kan. App.2d at 538–39). The matter was remanded for a hearing. Notably, the state had not argued on appeal that the testimony was for the purpose of explaining why the investigation focused on Petitioner and not Seeber. Judge Malone, in his concurring opinion, stated that the testimony was not impermissible vouching but an explanation of the investigation. *Id.* (citing *LaPointe II*, 42 Kan. App.2d at 557). The court of appeals noted that "Judge Malone [had] picked up on the argument in the State's brief

---

[3] A review of the transcript shows that Smith did make an objection at the end of this testimony. The objection was not based on vouching, however, but rather that the answer was beyond the scope of the question. The court sustained the objection. Smith did not request to strike the testimony or admonish the jury to disregard the testimony. *LaPointe II*, 42 Kan. App.2d at 536.

before the district court which characterized Atwell's testimony not as an opinion on the credibility of another witness, but rather as an explanation of why Atwell focused his investigation on LaPointe." *Id.*

During the evidentiary hearing at the district court, the state argued that the testimony was not improper vouching but rather explaining why the investigation turned towards Petitioner and away from Seeber. Smith testified that at the time of trial it did not seem that Atwell was vouching. (R. May 18, 2011, Hrg., p. 93.) He further testified that he could see it "both ways" when he reviewed the testimony at the hearing. (*Id.*) The district court determined that Atwell was not improperly vouching and that decision was affirmed. The court of appeals reasoned as follows:

> Given the nature of the testimony from Wellman and Loveall, we fail to see how LaPointe was prejudiced by Atwell's explanation of the reason for his decision to pursue the investigation of LaPointe. Atwell's testimony explaining the path of the police investigation did not deprive LaPointe of a fair trial. Judge Bennett did not err in holding that Smith's failure to object to Atwell's testimony did not fall below the standard required of competent counsel and that LaPointe was not deprived of a fair trial by Smith's failure to object.

*LaPointe III*, 2012 WL 4372995, *7.

Petitioner objects to the court of appeals' finding and contends that it is an unreasonable application of *Strickland*. Petitioner spends a large portion of his argument on the court of appeals' decision in *LaPointe II*. Again, this court is reviewing the final decision of the state court. Notably, the court of appeals held that the decision in *LaPointe II* was not the law of the case and that it had not been directly presented with the argument that the testimony was an explanation of the investigation:

> The appellate court in *LaPointe II* was never asked to consider the applicability of the caselaw prohibiting one witness from vouching for the credibility of another witness when, as now argued, the testimony was elicited in order to explain the course of the criminal investigation. The *LaPointe II* majority did not examine the testimony in this context. Consequently, the issue as now framed remained

undecided when the case was remanded to the district court, and the law of the case doctrine did not apply.

*Id.* at *5.

While Petitioner argues that *LaPointe III* directly contradicted *LaPointe II* and that decision is therefore clearly erroneous, Petitioner cites to no authority that would support a determination that *LaPointe III's* holding regarding the law of the case doctrine is unreasonable under federal law. As stated earlier, the initial decision in *LaPointe II* was decided prior to an evidentiary hearing and, as the court of appeals stated, argued on a different basis. Therefore, this court is examining the decision of the state court in *LaPointe III*, which was the final state court decision on this issue.

As stated by the court of appeals, a witness cannot express an opinion as to the credibility of another witness. *State v. Drayton*, 285 Kan. 689, 700, 175 P.3d 861, 871 (2008) (citing *State v. Jackson*, 721 P.2d 232 (Kan. 1986)). "This is because the determination of the truthfulness of a witness is for the jury." *Id.* The court of appeals held that the testimony was elicited to explain the course of Atwell's investigation and to address the contention that the police conducted a "shoddy investigation." *LaPointe III*, 2012 WL 4372995, *7. The court of appeals concluded that trial counsel's failure to object on the basis of vouching did not fall below the standard of competent counsel. *Id.* The court agrees. At the time Atwell testified, both Wellman and Loveall had testified. They both explained how they picked out the individuals in the photo line-up. This testimony was consistent with Atwell's testimony. Prior to the testimony, Smith had criticized the investigation because the police never followed up with Seeber. Therefore, it was appropriate for the prosecutor to ask Atwell why he did not contact Seeber. Atwell was testifying as to why he took the direction he did in the investigation. *See United States v. Magallanez*, 408 F.3d 672, 679 (10th Cir. 2005) ("The testimony of the agents served legitimate purposes. For instance, it provided necessary background about the nature of the investigation, without which the jury would have

been deprived of understanding how and why the drug enforcement agents proceeded as they did."); *see also LaPointe III*, 2012 WL 4372995, *7 ("The *Bledsoe* court also noted that the district court concluded that Dunnaway's testimony was admissible opinion testimony under K.S.A. 60–456. The court concluded: 'This statement also helped to explain the course of the investigation, which turned from Tom to Floyd.'") (citation omitted). Therefore, counsel's performance did not fall below the standard set forth in *Strickland*.

Moreover, even if the testimony was impermissible vouching, Petitioner has not established that he was prejudiced by the testimony. Petitioner must show that "but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different." *Snow v. Sirmons*, 474 F.3d 693, 719 (10th Cir. 2007) (quoting *Boyd*, 179 F.3d at 914). This is determined by looking at all of the evidence. *Id.* at 720.

Petitioner argues that there is a reasonable probability of a different outcome because the only other evidence of his involvement in the robbery came from Norton. Petitioner argues that Norton's testimony was entirely inconsistent. Essentially, Petitioner is arguing that the case against Petitioner really hinged on the eyewitness identification by Loveall which was improperly bolstered by Atwell.

As pointed out by the state, however, Atwell's testimony regarding the eyewitnesses' identifications was consistent with their testimony. Wellman testified that she only picked out someone because she felt she had to. She testified that she would not recognize the robber if she saw him again. Moreover, his face was partially concealed with a bandana and she was scared during the robbery. She only looked at him for about 20 seconds and just "could not look at him anymore" because she was scared. (R. Vol. IV. Pg. 41.) Based on her testimony at trial, Wellman was not even confident in her own selection. Her testimony that she was scared was consistent

with Atwell's testimony that she was under duress when she saw the robber. Turning to Loveall, although she did not recall some of the events of the day of the robbery at the time of trial, she did testify that she stared at the robber when she was outside in the parking lot. She also testified that she could identify him if she saw him again. Loveall then identified Petitioner as the robber during the trial. Even if the objected-to testimony by Atwell was omitted, the jury would have been presented with Wellman's testimony regarding her lack of confidence in her pick and Loveall's in-court identification of Petitioner.

The court of appeals also noted that the jury was instructed to consider the reliability of eyewitness testimony by reviewing various factors, including the emotional state of the witness and the opportunity the witness had to observe the robber. (R. Vol. I, 266, Inst. 9.) The jury was also instructed that it was up to the jury to determine the weight and credit of the testimony of each witness. (R. Vol. I, 264, Inst. 7.) There is no evidence to support a finding that the jury did not follow the instructions in this case.

Moreover, although Norton's testimony contradicted other evidence in the case, i.e. regarding where the robber discarded his shirt, cap, gloves, and bandana, Norton testified that Petitioner committed the robbery and that Petitioner threw the shotgun on the top of the building. The shotgun was recovered on top of the building. Loretta also testified that she saw Petitioner with a sawed off shotgun in early October 2000.

Based on a review of the evidence, Petitioner has not shown that there is a reasonable probability that, but for Atwell's testimony regarding the identifications, there would have been a different outcome at trial. The court of appeals' determination that Petitioner was not prejudiced by the evidence is not objectively unreasonable under the AEDPA's standards.

Petitioner's application for relief on this ground is denied.

## II.     Conclusion

Petitioner's application for habeas corpus (Doc. 1) is DENIED.   Respondents' motion to strike (Doc. 26) is GRANTED IN PART and DENIED IN PART.


**IT IS SO ORDERED** this 31st day of October, 2019.

___s/ John W. Broomes _____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE